# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 13, 2008      Decided December 23, 2008

No. 07-1328

AMERICAN FOREST AND PAPER ASSOCIATION,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

COGENERATION ASSOCIATION OF CALIFORNIA, ET AL.,
INTERVENORS

———

On Petition for Review of Orders
of the Federal Energy Regulatory Commission

———

*Donald J. Sipe* argued the cause for petitioner. With him on the briefs was *Jonathan G. Mermin*.

*Sara D. Schotland* and *Wayne R. Bidstrup* were on the brief for *amicus curiae* Electricity Consumers Resource Council in support of petitioner.

*Robert H. Solomon*, Solicitor, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were *Cynthia A. Marlette*, General Counsel, and *Judith A. Albert*, Senior Attorney.

Before: GARLAND and BROWN, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* BROWN.

BROWN, *Circuit Judge*: Petitioners insist the term "markets" as used in the recent amendment to the Public Utility Regulatory Policies Act ("PURPA") must always denote a competitive market. The Federal Energy Regulatory Commission ("FERC") interprets the word "markets" to encompass both competitive and non-competitive markets. Because FERC's interpretation is reasonable, we deny the petition for review.

## I. Background

Congress enacted PURPA in 1978, 16 U.S.C. § 824a-3, to encourage expansion of alternative energy by requiring utilities to purchase energy from "qualifying facilities" ("QFs"). *Id.* § 824a-3(a); 18 C.F.R. § 292.303(a). FERC was charged with promulgating rules pursuant to PURPA, which imposed certain mandatory "obligations to purchase" — situations in which a utility had to buy energy from a QF. 18 C.F.R. § 292.303(a).

After almost three decades and apparently based on changes in the energy industry, Congress amended PURPA in 2005 creating exceptions to the mandatory purchase obligation. *See* 16 U.S.C. § 824a-3(m). If FERC finds the circumstances specified in section (m)(1) are satisfied, utilities may be relieved of the obligation to purchase energy from a QF. *Id.* § 824a-3(m)(1).

Section 824a-3(m)(1) refers to "markets" several times. In a formal rulemaking, FERC interpreted the term "markets" in subparagraph (m)(1)(A) as encompassing both competitive and

non-competitive markets.  *See* New PURPA Section 210(m) Regulations Applicable to Small Power Production and Cogeneration Facilities, 71 Fed. Reg. 64342, 64345 (Nov. 1, 2006) (to be codified at 18 C.F.R. pt. 292) ("Final Rule"). American Forest and Paper Assocation ("AFPA") petitioned for review, arguing FERC's interpretation was unreasonable.

## II.  Discussion

This Court analyzes FERC's interpretation under the familiar standard set forth in *Chevron v. NRDC*, 467 U.S. 837 (1984).  Under step one, we ask whether the statutory language is ambiguous.  *Id.* at 842–43.  Under step two, we ask whether the agency's interpretation is reasonable.  *Id.* at 843.  Section 824a-3(m)(1) is divided into three provisions, creating three distinct exemptions.  Under the statute, a utility is exempt if the relevant QF has "nondiscriminatory access" to:

(A) (i) independently administered, auction-based day ahead and real time wholesale markets for the sale of electric energy; and (ii) wholesale markets for long-term sales of capacity and electric energy; or

(B) (i) transmission and interconnection services that are provided by a Commission-approved regional transmission entity and administered pursuant to an open access transmission tariff that affords nondiscriminatory treatment to all customers; and (ii) competitive wholesale markets that provide a meaningful opportunity to sell capacity, including long-term and short-term sales, and electric energy, including long-term, short-term and real-time sales, to buyers other than the utility to which the qualifying facility is interconnected. In determining whether a meaningful opportunity to sell exists, the Commission

shall consider, among other factors, evidence of transactions within the relevant market; or

(C) wholesale markets for the sale of capacity and electric energy that are, at a minimum, of comparable competitive quality as markets described in subparagraphs (A) and (B).

16 U.S.C. § 824a-3(m)(1). AFPA challenges FERC's interpretation of the word "markets" in section (A)(ii).

The first step of the *Chevron* analysis is straightforward. When "markets" is used in section (A)(ii), no specification is given as to whether the markets must be competitive or non-competitive. By contrast, the markets described in both (B)(ii) and (C) specifically use the word "competitive." Although (A)(ii) involves other descriptors, such as "wholesale" and "for long-term sales," silence concerning competitiveness in (A)(ii) creates ambiguity. *See Texas Mun. Power Agency v. EPA*, 89 F.3d 858, 869 (D.C. Cir. 1996) ("In view of its silence on the point at issue, we must hold the statute ambiguous."). *See also Chevron*, 467 U.S. at 843 (referring to silence and ambiguity jointly). The reference in subparagraph (C) to "comparable competitive quality" suggests that the markets described in (A) may have some competitive feature, but the language in (C) is not so strong as to alleviate all ambiguity. Particularly here, where markets in other sections of the statute are specifically denoted as "competitive," silence as to competitiveness in (A)(ii) leaves open whether Congress intended a competitiveness requirement in that provision — a prototypical case for an agency's gap-filling role under *Chevron*.

Having completed step one of *Chevron*, the next question is whether FERC's interpretation is reasonable. Several factors reveal that it is. FERC's interpretation is consistent with the

maxim that "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983). Because the two uses of the term "markets" occur within the same statute — indeed, in neighboring sentences — the use of the descriptor "competitive" in subparagraphs (B) and (C) suggests that no such requirement was meant for subparagraph (A). "[W]hen Congress uses different language in different sections of a statute, it does so intentionally." *Shays v. FEC*, 528 F.3d 914, 934 (D.C. Cir. 2008).

FERC's interpretation — that the markets in (A)(ii) can be competitive or non-competitive — is consistent with the common usage of the word "markets." Indeed, this Court has often referred to non-competitive markets or monopolistic markets. *See, e.g.*, *Columbia Gas Transmission Corp. v. FERC*, 477 F.3d 739, 744 (D.C. Cir. 2007) (referring to "non-competitive markets"); *Tenneco Gas v. FERC*, 969 F.2d 1187, 1199 (D.C. Cir. 1992) (referring to a "monopolistic market" attribute). Black's Law Dictionary defines a market as a "place of commercial activity in which goods or services are bought and sold." BLACK'S LAW DICTIONARY 988 (8th ed. 2004). Notably, this definition has no requirement that a market be competitive. *See also* WEBSTER'S II NEW COLLEGE DICTIONARY 686 (3d ed. 2005) (defining "market" as "a place where goods are offered for sale"). As the Supreme Court has said, "the words of statutes . . . should be interpreted where possible in their ordinary, everyday senses." *Malat v. Riddell*, 383 U.S. 569, 571 (1966). A "market," in the everyday sense of the word, can be either competitive or non-competitive.

For its part, AFPA cites several cases which refer specifically to "competitive markets." *See, e.g.*, *Consumers*

*Energy Co. v. FERC*, 367 F.3d 915, 922 (D.C. Cir. 2004), *La. Energy & Power Auth. v. FERC*, 141 F.3d 364, 365 (D.C. Cir. 1998), *Elizabethtown Gas Co. v. FERC*, 10 F.3d 866, 870 (D.C. Cir. 1993) (all using the phrase "competitive market"). AFPA cites these cases in order to advance its argument that courts have consistently required markets to be competitive under the Federal Power Act. This argument is flawed for several reasons: First, the mere usage of the adjective "competitive" in front of the noun "market" does not mean all markets must be competitive; it only shows the particular market in question was determined to be competitive. Indeed, the modifier actually suggests *not all* markets are competitive — hence the need to describe competitive markets as such. Second, as cited earlier, it is equally easy to find cases which use the phrase "non-competitive markets." The fact that courts use both forms shows that the word "markets," by itself, says nothing about competition. Finally, AFPA only cites to usage by courts; none of the cases cited by AFPA deals with use of the word "markets" in a statute.

Another factor supporting the reasonableness of FERC's interpretation is the structure of subparagraph (A) itself. To meet the exemption under subparagraph (A), the utility must satisfy two clauses: (A)(i) and (A)(ii). The first clause, (A)(i), requires "independently administered, auction-based day ahead and real time wholesale markets for the sale of electric energy." 16 U.S.C. § 824a-3(m)(1)(A)(i). The parties agree the requirements built into (A)(i) contain an inherent level of competitiveness. Because (A)(i) requires the markets to be "independently administered" and "auction-based," there is some element of competition. On FERC's view, the inherently competitive features in (A)(i) were enough for Congress; no extra requirement of competitiveness was needed in (A)(ii). In other words, independent administration and auction-based sales provide sufficient indicia of competition. Of course, we need

not decide the correctness of this question — only that FERC's interpretation was reasonable. It was.

The parties dispute the significance of subparagraph (C), which refers to markets "of comparable competitive quality as markets described in subparagraphs (A) and (B)." *Id.* § 824a-3(m)(1)(C). FERC argues the reference to "comparable competitive quality" refers only to the fact that both subparagraphs (A) and (B) have competitive features — (A) by virtue of the features described in clause (A)(i) and (B) by virtue of the explicit requirement of "competitiveness." AFPA, on the other hand, insists the language in subparagraph (C) requires an *equal* level of competitiveness in (A) and (B). On its view, the potentially lower level of competitiveness created by the features in (A)(i) does not suffice.

As AFPA recognizes in its brief, subparagraph (C) is "not . . . a masterpiece of legislative draftmanship." Pet'r's Br. 42. Because of the lack of clarity in subparagraph (C), we believe both FERC and AFPA present reasonable interpretations. Step two of *Chevron* does not require the best interpretation, only a reasonable one. Given that the features described in (A)(i) contain an inherent level of competitiveness, it is sensible to read the language in (C) as referencing back to the (A)(i) features without inserting a competitiveness requirement into (A)(ii) where Congress did not include it.

Also unpersuasive is AFPA's argument relating to § 824a-3(m)(3), which requires a "factual basis" for utilities to qualify under subparagraphs (A), (B), or (C). 16 U.S.C. § 824a-3(m)(3). AFPA argues that, without a requirement of competitiveness in (A)(ii), the factual basis requirement is a nullity. Of course, this argument ignores the other features required under subparagraph (A). But more importantly, AFPA's concern is answered by the system of review enacted by

FERC. The determinations made by FERC in its final rule are merely rebuttable presumptions. Final Rule, 71 Fed. Reg. at 64343–44; 18 C.F.R. §§ 292.309(c), (d), and (e). After utilities submit information to FERC relevant to an exemption from the mandatory purchase obligation, a QF may rebut the presumption by showing, for example, that it lacks non-discriminatory access to the market in question. 18 C.F.R. § 292.309(e). The fact that FERC chose to adopt certain rebuttable presumptions via rulemaking, rather than by case-by-case adjudication, does not violate any of the statute's requirements. And, as we have long held in such scenarios, the "decision whether to proceed by rulemaking or adjudication lies within the [agency's] discretion." *N.Y. State Comm'n on Cable Television v. FCC*, 749 F.2d 804, 815 (D.C. Cir. 1984). *See also NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294 (1974).

Finally, AFPA asserts that, lacking a requirement of competitiveness in (A)(ii), QFs will be subject to rates not meeting the "just and reasonable" requirements of 16 U.S.C. § 824d(a). However, any rates that may result from § 824a-3(m) are not presently before us. If and when utilities set rates which any particular QF considers unjust or unreasonable, that QF can file an action under § 824d(a).

For these reasons, we conclude FERC's interpretation of the term "markets" in 16 U.S.C. § 824a-3(m)(1)(A)(ii) was reasonable. The petition for review is denied.

*So ordered.*